ítuiTlN. Chief Justice.
 

 The importance of this suit to the parties, and the nature of some of the questions discussed in it, which were novel among us, make it gratifying to the Court that they have been brought up for a reconsideration by a petition to rehear the decree. It is especially so, as upon further reflection it is found that some general propositions were stated in the opinion given, that are not entirely correct; and that on other points further information, than was then laid before the Court, was necessary to doing exact justice between the parties.
 

 Upon the principal question before discussed and adjudged, the Court sees no reason to alter the decree. That was upon the validity of the deed of the 13th September 1824, as an agreement of purchase, or as an agreement for measuring the compensation of
 
 J. J). Hawkins,
 
 as a trustee. No doubt, the trust was troublesome and responsible, and required Mr.
 
 Hawkins’
 
 personal at* tention. It is clear too, as stated in the decree, that the defendant had with both diligence and skill, discharged the trust. It is equally true, that it was understood by the parties, as admitted in the bill and collected from some of the deeds of trust, that Mr.
 
 Hawkins
 
 should receive compensation; and that his care, personal labor, time, and loss of attention to his own affairs, and the ad
 
 *331
 
 vantage derived by Mr.
 
 Boyd
 
 from his services, altogether may, and do constitute a meritorious consideration for a proper agreement for remuneration, and for
 
 the
 
 ultimate allowance of a liberal remuneration. But upon the principle of equity which has long formed the law of this Court for the regulation of dealings between parties standing in the relations these did, at the time of entering into the articles of September, such an agreement cannot be sustained, though not obtained by actual imposition.
 

 _ . , tween trustee and
 
 <¡e>tmque
 
 a prudent man Reformer might conscien-ceptfromastran-set-
 

 Without going through the cases again, it will be sufficient to state, that although all bargains between trustee and
 
 cestui que trust
 
 are not absolutely void, yet they are not favored, but are the objects of distrust. Generally, they have been regarded as mere securities, if in the event they turned out to be very gainful to the trustee and prejudicial to the other party, and unless the whole subject was clearly understood by the
 
 cestui que trust
 
 in its circumstances and their legal consequences. Even then, the contract has not been permitted to stand, when it was not freely entered into by the party under protection, without any undue influence on the, part of the trustee, or any pecuniary necessity» or mental embarrassment on the other side. To gain the countenance of the Court therefore, such agreements
 
 must,
 
 as it has been said, prove to be fair and reasonable — such as the
 
 cestui que trust,
 
 as a prudent man, might or would again enter into, and the trustee might, consistently with his duty, advise him to make with another person. It is impossible to define the sources- of secret influence, which one person may,,in their relative situation, have over another, imperceptibly to the world, and almost to themselves, and when it is not sought nor even desired’; an influence which may not only control actions, but color the opinions and determine the judgment of the dependent party. It is wrong to engage him reluctantly in a contract known to be to his prejudice, and it is hardly less so to insist upon a contract with him, thought equal at the time, and to which he made no objection, but which in fact was to his prejudice, and which,
 
 *332
 
 0n that ground, and upon his discovery of it, he is reluctant to proceed in. One reason why the Court leans this way is, that regarding such dealings as definitive contracts, they would conclusively bind the
 
 cestui que trust
 
 at all events, and might do great injustice. But taking them to be voidable, and
 
 prima facie
 
 to be supported by the aid of collateral proofs, the Court always has the' power of disposing of them in a way that will secure all parties, and do complete justice.
 

 In the case before us, it cannot be doubted, that, certainly in Mr.
 
 Boyd’s,
 
 and probably, in Mr.
 
 Hawkins’
 
 opinion, the latter was the owner of
 
 Brown’s
 
 judgment, and could, without violating either a rule of law or morality, use it for his own benefit, by selling under it, and buying in the trust property — unquestionably that supposition entered materially and mistakenly into the agreement of September, it is recited in it and is fairly stated in the answer to have been one of the main motives. Here then is at once a clear mistake in the essence of the contract. If the truth had been known, Mr.
 
 Hawkins
 
 would never have advised the other party to come, nor would he have consented that he should have come, to such an agreement with any body else. Again, Mr.
 
 Boyd
 
 only did not know the true state and value of the property of which he was disposing, but seems to have had a different opinion upon that subject every succeeding day, and it is extremely probable that it was so uncertain, that Mr.
 
 Hawkins’
 
 own opinion frequently fluctuated ; at all events,
 
 Boyd’s
 
 spirits seem alternately to have been greatly elated and depressed; so that there is no likelihood that in any treaty then carried on, he either reflected coolly, or stipulated upon any confidence in himself. Now, although Mr.
 
 Hawkins
 
 may not have intended any advantage, and may not then have believed he was gaining any undue advantage, yet it is certain, that
 
 Boyd
 
 was not in a condition to protect himself, that he did not stand on his rights, that he would have yielded more, if more had beed asked ; and that Mr.
 
 Hawkins
 
 absolutely refused to accept all that was offered. The case really then, is that of a bargain
 
 *333
 
 made all on one side; and therefore as a contract, it cannot be enforced ; because it turns out to be too much to the advantage of the one, and to the prejudice - of the other. It is for these reasons, that contracts between trustee and
 
 cestui que trust
 
 can hardly be said tobe binding until the relation is dissolved, and a confirmation is given, as in the case of a conveyance from a ward to one who has been his guardian. But, independent of the relation of trustee and
 
 cestui que trust,
 
 merely as such, that which actually existed between these parties was peculiar — the trust being of the whole estate of
 
 Boyd,
 
 for sale, to pay very large debts, which gave the trustee a control over his will, that could hardly be resisted. It is by no means declared that it was sought from sinister motives, or that it was exercised with any intent to oppress. But we cannot but see, that it might be so exercised; and that in fact an agreement was obtained, that may have been the result of it. It is the danger of such consequences that has given rise to the rule of equity, as one of legal policy in prevention of fraud; on which the Court is bound to relieve, although there be no actual fraud, but only a loss upon an improvident bargain — such a bargain ought not to be gained nor insisted on. The Court doth therefore affirm so much of the decree complained of, as declared that deed void for any of the purposes for which it was set up in the answer, and as sustained the first exception taken by the plaintiff to the report.
 

 In the decree, the defendant was allowed the sum of Ü31500 as a compensation under all the deeds. It is now right to correct the decree in that respect; first, because the allowance was upon a wrong principle, being in a round sum as for an agency, and not «s a commission, which the Court declared was against the rule of equity; and secondly, that it was not adequate, if the principle was right.
 

 It is not seen how the error in the mere matter of law could prejudice the defendant, since the Court made him an allowance, as being agreed for in the deeds, and submitted to in the bill, except so far as its being a proper
 
 *334
 
 subject of compact might tend to sustain the deed of September. For the reasons already given, it could not have that effect; because, as a compensation it is not, in the event, fair and reasonable.
 

 In England it is clear that trustees who are
 
 quasi
 
 officers of the law as executors, &c. have no right to compensation, and by analogy the rulo is extended to trustees by compact.
 

 But hero by the act of 1799,
 
 (Rev. c. 536,J
 
 a different rule has been introduced as to executors, &c.
 

 But, I believe the proposition as a rule of law cannot stand. Nothing can be more certain than that the opinion given by the Court was drawn from the purest and most undoubted sources of equity as established in England. There trustees are not paid in any mode. We thought it dangerous to do it, especially by the way of commission here, although it may be admissible as an allowance for time and labor; because it presents temptations in cases, where sales are not the direct and sole objects of the deed, for the trustee to make them unnecessarily, or to hurry them on, to the detriment of the debtor. In England, trustees seldom act personally, or are more than the nominal owners of the legal title. The business of the trust, as are almost all other negotiations, is conducted by solicitors and law agents, by whom the compensation is derived. For
 
 this
 
 reason probably the trustees which may be denominated public, as having their origin in the law, such as guardians, executors, and committees, are held to be honorary; and by consequence, those which are constituted by contract are put on the same footing. This is not so much upon the idea that men are not to have reward for their labor, as that these persons do not labor, but that those who are put in their place do.
 

 The state of our country, and the habits of our people are so different as to have induced
 
 the
 
 Legislatures of nearly all the States, including our own, to introduce provisions by statute for competent remuneration to those to whom the law commits the charge and care of the estates of infants and deceased persons. Individually, I doubt the policy of such regulations, and my doubts are founded on the observation of much practical injustice suffered by the
 
 helpless;
 
 and I cannot but believe, if ever professional persons should become so numerous as to be readily accessible to all such trustees as convenient agents, whose services can be substituted
 
 *335
 
 for their own persona] attentions,’ that those laws will be repealed, because the business can then be better done and the risk of imposition in charges better provided against. But while the present necessity exists, the rule perhaps must be retained as the means of engaging honest and competent men, in moderate circumstances, to undertake such duties.
 

 And as equity follows the law, the rule as to trustees hy comps is also altered. teos by comPaci)
 

 It is natural that Courts of Equity, acting upon one of the most aneient and approved of their maxims, should follow the law, and adopt, in the case of conventional trustees, the rule applied by the statutes to public ones. This has been done in almost every State in the Union, we believe ; at least as far as we have had an opportunity of examining their adjudications. It is in Massachusetts,
 
 (16 Mass. Rep. 227,)
 
 in Pennsylvania and New Jersey, as appears in
 
 Manning
 
 v
 
 Manning,
 
 (1
 
 John. C. C. 529,)
 
 in Maryland (1
 
 Har. and Gill.
 
 18,) in Virginia, (1
 
 Wash.
 
 246. 4
 
 Hen. and Mum.
 
 415,) and in Soulh-Ca-rolina, (4
 
 Dess.
 
 110.) In New York, Chancellor
 
 ICent
 
 expressed himself strongly in favor of the English rule and refused compensation in
 
 Green
 
 v Winter,
 
 f
 
 1
 
 John. C. C.
 
 26;J but be was compelled to yield, when a subsequent act of the Legislature authorised the Courts to make an order in favor of public trustees. And, In answer to an enquiry, that eminent person has done the Court the honor to say, through one of its members, that he understands the old rule, denying compensation to trustees, to be pretty much abolished throughout the country, for that the statutes give it to guardians, executors and admistrators, and the Courts make a reasonable allowance to receivers appointed by them, besides reimbursing their expenses, and the equity of the statutes is hy construction generally extended to conventional trustees, when the agreement is silent.
 

 To so strong a current of authority, this court does not feel at liberty to oppose the resistance of its judg ment singly; but must yield, (even were it with hesitation,) to the extent of a reasonable allowance. "We are informed too, that it has been usual in some parts of this State, for trustees to charge for services; and that the
 
 *336
 
 profession have no decided opinion against it. The amount will, of course, be according to the circumstances, and not beyond that which would under the Statutes be made to executors; and if fixed by the parties, it will be subject to the revision of the Court and will he reduced to what is fair, or altogether denied, if the stipulation for it has been coerced by the creditor as the price of indulgence, or as a cover to illegal interest, or the conduct of the trustee has been
 
 malajide,
 
 and injurious to the
 
 cestui que
 
 trust. Whether it shall be given
 
 as
 
 a commission or not, is hardly worth disputing about : that may be a convenient mode of computing in most cases; but the true object is a
 
 just allowance
 
 for time, labor, services and expenses, under all the circumstances that may be shewn before a master.
 

 In the case before us, the Court supposed that the circumstances appeared as fully as they could be at any time shown by the parties, and therefore proceeded to fix, at once, an allowance. Upon reflection, this is deemed to have been premature; as that view of the subject was not in the contemplation of the parties; or of the master, who took the accounts upon the basis that the agreement of September was binding. The decree must therefore be corrected in these respects ; and it must now be referred to the master to ascertain, (without any reference to the ageeement of the 18th of September, 1824,) and report what is a just allowance to the defendant as before mentioned, and taking into account the payments under the decree, if any, state the balance that may be duo between the parties. In taking the account, the master will also credit the defendant with the sum of S72, received by the complainant
 
 Boyd,
 
 as the rent of the blacksmith’s shop in Boydton, which was overlooked in the computation on which the decree was based.
 

 The decree will also be extended by declaring the title of the defendant to the blacksmith’s shop in Boyd-ton, and to the slave
 
 Patsy
 
 a good one, and requiring the plaintiff to surrender the possession of, the shop and desist from any actions or suits in this State for or concerning them.
 

 A court of equi-Í7. Wl11 “ot in the court of neither wilfifdi-rect a particular chanéery suit thus pending, putting*! bparty t0 his election,
 

 Upon that part of the decree which directed the suit pending in the Court of Chancery in Virginia, to be dismissed, there has been some difficulty, and the Court is not unanimous. The cases cited at the bar establish that the Chancellor in England does not confine himself to putting the parties to an election: but where they are within his jurisdiction, he restrains them by injunction from carrying on a suit previously commenced in Ireland or Scotland, and proceeds in the whole matter himself. This is commonly put upon the ground that the House of Lords is the common superior of all those Courts. But that cannot he the true ground ; for the like jurisdiction is taken where the first suit is in a foreign country, or in a Colony, from which the appeal is to the King in Council. .It seems to be assumed, that more complete justice can be done in the English Chancery. I wish it to be understood that I disavow altogether any such arrogance on the part of the Court in making the decree in this case. It primarily was not thought of, much less acted on. The sole ground with us was, that of the election of the parties. It is true that the pendency of a suit in another State is not, as a plea, a bar to one here. Yet, I conceive that no Court will suffer one of its suitors to vex another with two suits at the same time, for the same thing, be the other pending where it may, and upon the motion of either, will refuse to proceed in the one before it, unless the other be dismissed. These parties all live within this jurisdiction, and each admitting in the pleadings that the suit was pending in Virginia, went fully into the case here, the defendant insisting in his answer on a trial here on the merits. This struck me as an election, and that as it was improper that the other suit should go on with this, or after it was decided, the Court ought, after a decision, to make it compulsory on the parties to dispose of it. This too, was considered the most respectful course to the Courts of Virginia, as it might prevent a conflict of decision, and the consequences of process of contempt to enforce opposite decres ; for it did not appear to us that any decree had been made in Virginia.
 
 *337
 
 These reasons still induce me to abide by the former decree.
 

 But my brethren think otherwise, and I cheerfully yield to them, as the reasons of their judgment chiefly refer to the relation which the Courts bear to each other as tribunals of sister States, and the comity which, it is supposed, should be displayed by the one towards the other. We have been able to find no precedent for the decree in the decision of any of the States ; and although, in general, a Court of Equity having a party before it may make him do what may seem right, yet they think that he ought not to be enjoined to any act in the Court of a sister State, because it must be presumed that Court will, in administering its own justice, make him do the same act, and at all events, the contrary ought not to be anticipated. The Courts of the United States, for this reason, I’efuse to entertain a bill to enjoin a judgment in a Court of law of a State.
 
 (Diggs
 
 v
 
 Wolcott, 4 Cranch 179, McKim
 
 v
 
 Voorhies, 7 Ib. 278.)
 
 In
 
 Mead
 
 v
 
 Merritt, (2 Paige's Pep.
 
 403,) Chancellor
 
 Walworth
 
 decided that be would not entertain a suit to enjoin judicial proceedings previously commenced in another State
 
 ;
 
 in which I fully agree with him, upon the presumption that justice will be done there, as well as it would be upon the new suit in our own Courts. But he remarks further, that although the Court has the physical power to act coercively upon the parties within its jurisdiction, yet he was not aware that any
 
 Court of
 
 Equity in the Union, had deliberately
 
 deckled to
 
 exercise the power, by injunction on the parties to dismiss a suit in another State, for it might
 
 be
 
 retaliated, and between the Courts both parties be brought into contempt. My brethren think we ought not to sot the precedent, nor expose these parties to the risk of incurring the censure of the Court in Virginia
 
 ;
 
 for we cannot know whether that Court will allow' the suit to be dismissed. If it ought to be, because the matters aro decided between the parties in their own State, that Court will do itwith-out our order, and of its own mere motion. They
 
 think
 
 too, that, although this Court might put the parties to
 
 *338
 
 an election, yet it was not done, and that the parties did not, of themselves, elect by first trying here. It is possible also that other matters may be involved in that suit, which might have prevented an order to elect, had a motion been made; for then the party making it must have shewn by the proceedings, that the subjects were the same. Upon this last point, I took it from the pleadings that the whole matter of that suit formed a part of the one here, and I still suppose so, because the contrary is not stated by the defendant on affidavit, nor suggested in the petition. However, without that, the majority of the Court is of opinion, that the decree was erroneous ; and that the parties must be left to avail themselves of the decree here as they may be able in Virginia, where it will doubtless receive full faith and credit. That part of the decree is therefore reversed and the parties left at liberty to proceed in the suit in Virginia as they may be advised and allowed by the Courts in that State.
 

 Costs wrere given against the defendant, because the principal matter in controversy, which made a suit unavoidable by the complainants, was decided against the defendant. This seems to us still to be proper, although a small cash balance might be found due to the defendant. However as the case is to go again before the master, that ground for the rehearing will be reserved until the coming in of the report, and a motion for directions on it.
 

 Per Curiam. — Decree corrected accordINGiy.